IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES HARRIS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 08-2126 |
| MICHAEL PAIGE | : | |
| and | : | |
| CITY OF PHILADELPHIA, | : | |
| Defendants. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**　　　　　　　　　　　　　　　　　　　　　　　　　　**MAY 9, 2011**

　　　　Presently before the Court is Defendant Michael Paige's ("Officer Paige") Motion for Summary Judgment,[1] and Defendant City of Philadelphia's (the "City") Motion for Summary Judgment. For the reasons set forth below, Officer Paige's Motion will be denied and the City's will be granted.

**I.　　BACKGROUND**

　　　　On May 7, 2008, Plaintiff James Harris ("Harris") filed a Complaint against Officer Paige and the City of Philadelphia (the "City") alleging that Officer Paige, who was employed as a Philadelphia police officer at the time of the alleged incident, sexually assaulted Harris by forcing

---

[1]Officer Paige names his Motion a "Motion Pursuant To F.R.C.P. Rule 12(b) To Dismiss." However, he later repeatedly refers to it as a summary judgment motion and, in fact, in his "Standard of Review" cites Federal Rule of Civil Procedure 56(c) and cases relating to motions for summary judgment. Accordingly, we will treat this Motion as a Motion for Summary Judgment.

him to engage in oral sex and other sexual acts under the show of authority, while on duty as a Philadelphia police officer, and under the color of state law. (Compl. ¶ 2.)

In the early morning hours of March 16, 2007, Officer Paige was working the overnight shift as a City police officer. He was a uniformed officer assigned to patrol areas within the 92nd Police District, which included area of Fairmont Park in the City. At approximately 2:00 a.m., Officer Paige came upon Harris and another man sitting in a car and he had seen them "kissing." (Officer Paige Dep. at 119-120.) Harris alleges that under the pretense of conducting a traffic stop, Officer Paige ordered him and the other man out of his car, and after Officer Paige discovered that he did not have a driver's license, he ordered him to take the other man home and return to the park. (Compl. ¶¶ 16, 41.) When he returned to the park, Harris asserts that Officer Paige ordered him into the front seat of his patrol car. Officer Paige then drove to a locked and secluded area of Fairmont Park and forced Harris to perform unprotected oral sex on him three times while Officer Paige attempted to place his fingers in Harris' anus. (Id. ¶¶ 51-54, 60-64.) Officer Paige ejaculated into Harris' mouth and Harris spit the semen onto the ground of Fairmont Park. (Id. ¶¶ 77-78.) Officer Paige then drove Harris back to another area of Fairmont Park and released him. (Id. ¶ 106.) Harris gagged and/or vomited into a Styrofoam cup while driving home, and he promptly reported the incident to the District Attorney's Office. (Id. ¶ 110.) The Internal Affairs Department ("IA") of the Philadelphia Police Department ("PPD") was later able to recover this cup. After taking DNA samples from both Officer Paige and Harris, the contents of the cup were tested and found to contain sperm mixed with Harris' saliva. (Id. ¶¶ 107-109.) Internal Affairs conducted an investigation and issued its findings on June 15, 2007 concluding:

> The allegation that Officer Michael Paige sexually assaulted Mr.
> James Harris is **SUSTAINED**. Officer Paige withheld the
> paperwork for the vehicle belonging to Mr. Harris through
> intimidation in his position as a law enforcement officer, with the
> knowledge that Mr. Harris would have to return to the location of
> the stop. Officer Paige ordered Mr. Harris, upon his return, into his
> police car and drove to a secluded location not open to the general
> public and forced Mr. Harris to perform oral sex on him.

(Pl.'s Resp. Mot. Summ. J., Ex. 33.) Officer Paige was then arrested on April 30, 2007 and charged with assault, indecent sexual contact, kidnaping, false imprisonment, and unlawful restraint. (Officer Paige's Mot. Summ. J., Ex. 11.) He was also formally dismissed from the PPD on May 15, 2007. (City's Mot. Summ. J., Ex. N.) Officer Paige was subsequently found not guilty in a bench trial before Judge Rose Marie Nastasi-Defino of the Philadelphia Court of Common Pleas.[2] (Pl.'s Resp. Mot. Summ. J., Ex. 37 at 150.) After the acquittal, the Fraternal Order of Police ("FOP") filed a grievance with the City on behalf of Officer Paige over his discharge. Thomas McConnell Jr. was appointed as arbitrator (the "Arbitrator"). He stated in his decision that the issue to be decided was "Whether the City had just cause for the discharge of the grievant? If not, what shall the remedy be?" (Officer Paige Mot. Summ. J., Ex. 8 at 2.) In an

---

[2] Judge Nastasi-Defino stated after hearing the evidence and testimony: "The issue is a very simple issue. Did he [Officer Paige] and this other guy [Harris] consent to do what they did?" (Officer Paige Mot. Summ. J., Ex. 7 at 175.) Judge Nastasi-Defino concluded that the act in question occurred, but that it was consensual between the parties. She stated:

> I want the record to reflect in no uncertain terms that there was a
> sexual act that transpired between the complainant and the
> Defendant on this particular night in question and that the
> particular act that took place was the act of consensual oral sex and
> I think I made that clear because when you are arguing, I said there
> is no doubt– don't even argue the point. There is no doubt in my
> mind that that act took place on that particular night."

(Id. at 177-78.)

opinion dated March 30, 2009, the Arbitrator determined that "The evidence makes clear that Mr. Harris did perform oral sex on Mr. Paige on March 17, 2007, sometime between 2:30 a.m. and 5:00 a.m. Though this is denied by Mr. Paige, the DNA test results of sperm found in a Styrofoam cup Mr. Harris spat into after the oral sex, when combined with Mr. Harris' testimony, proves oral sex took place."[3] (Id. at 18.) The Arbitrator stated further that "The more difficult question relates to whether the sexual encounter between Mr. Paige and Mr. Harris was consensual, or whether as Mr. Harris claims this was a sexual assault." (Id. at 19.) The Arbitrator concluded that the City had not met its burden of proving that a sexual assault occurred. (Id. at 23.) He further concluded that the "evidence constitutes a 'course of conduct' which shows that Mr. Paige had little or no regard for his duties as a police officer, and that thus Mr. Paige is found in violation of Section 1.75 of the Disciplinary Code." (Id. at 28.) Despite this finding, the Arbitrator issued the following "award":

> The grievance is sustained in part and denied in part consistent with the foregoing opinion. The dismissal is reduced to a 30 day suspension. The City is ordered to offer the grievant immediate reinstatement to his former position as a police officer. The City is further ordered to restore the grievant's full seniority, and to make the grievant whole for any loss of wages (minus the 30 day suspension), benefits or other emoluments of employment flowing from the dismissal. The City is further ordered to adjust the grievant's personnel records to reflect the reduced discipline, and

---

[3]During his reinstatement arbitration hearing, Officer Paige claimed that he did not have any form of sexual contact with Harris. When asked if he had an explanation as to why his DNA matched what was in the cup retrieved by IA, Officer Paige incredulously testified that Harris could have gone into the wooded area of Fairmont Park where he had driven Harris around on the night in question and found a used condom of Officer Paige from previous sexual encounters he had with women in this area and dumped its contents into the cup. He stated: "Obviously, when I took him around various spots out there, he could have taken one of the condoms and placed it [his semen] in there [the cup]." (Pl.'s Resp. Mot. Summ. J., Ex. 37 at 149.)

4

to remove reference to the dismissal.[4]

(Id. at 31.)

Thereafter, Harris filed a Complaint in this Court averring violations under the Civil Rights Act of 1871, 42 U.S.C. § 1983,[5] against the City and Officer Paige by depriving him of "the rights and privileges secured to him by the United States Constitution and the laws of the United States under the color of State law." (Compl. ¶¶ 119- 153.) He also averred violations of the United States Constitution and the Pennsylvania Constitution against the City and Officer Paige, and state law claims of sexual assault, false imprisonment, battery, and infliction of emotional distress against Officer Paige. (Id. ¶¶ 154-178.) Officer Paige filed a Motion to Dismiss on August 12, 2009. We filed a Memorandum and Order on September 22, 2009 granting this Motion in part and denying it in part. We determined that Harris' claim for damages based on violations of the Pennsylvania Constitution be dismissed. See Harris v. Paige, No. 08-2126, 2009 WL 3030216, at * 1 (E.D. Pa. Sept. 22, 2009). Officer Paige filed this instant

---

[4] To say the least, this Court is unnerved by an award that could reinstate and only suspend for thirty days a police officer found guilty of having sexual relations while on duty, especially in light of this officer's past disciplinary record. Such record will be discussed in detail, infra.

[5] Section 1983 reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

42 U.S.C. § 1983.

Motion on January 21, 2011 and the City filed its Motion on January 22, 2011.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a

summary judgment motion.  Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted.  Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### 1. Municipal Liability Under § 1983

"A municipality cannot be held liable solely because it employs a tortfeasor."  Monell v. N.Y. City Dept. of Soc. Serv., 436 U.S. 658, 691 (1978).  Instead, the plaintiff must assert that an actual policy or custom of the municipality was the cause of the constitutional deprivation.  Id. In order to sufficiently allege "custom" for Monell purposes, a plaintiff must allege that the "practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."  Id.

A government policy or custom can be established in two ways.  Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict.  Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).  A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law.  Monell, 436 U.S. at 690; see also Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990).

Moreover, in actions involving police officers, a "plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact."  Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004)

7

(citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)). Deliberate indifference is the result of "a deliberate choice to follow a course of action [that] is made from among various alternatives by city policymakers." City of Canton, 489 U.S. at 389 (quoting Pembaur, 475 U.S. at 483-84). "It is a particularly wilful type of recklessness that is inherent in the deliberate indifference standard." Simmons, 947 F.2d 1042, 1060 n.13 (3d Cir. 1991). That indifference must be attributed to "lawmakers or other officials with the authority to make municipal policy." Id. at 1059. The Third Circuit has held that "neither [an unconstitutional municipal policy or custom] could be established absent conscious decisionmaking or acquiescence in a longstanding custom or practice on the part of a policymaker." Id. at 1064 (citing Andrews, 895 F.2d 1481). Negligence on the part of state officials is not enough to impute liability under § 1983. See Daniels v. Williams, 474 U.S. 327 (1986). Accordingly, to survive summary judgment under this standard, the plaintiff must produce facts tending to show the City knew of a pattern of constitutional violations or that such consequences were so obvious that the City's conduct can only be characterized as deliberate indifference. See Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990).

In addition, plaintiff must prove causation. The Third Circuit explained that "proof of the existence of a policy or custom alone is insufficient to maintain a § 1983 action. The plaintiff bears the burden of proving that the municipal practice was the proximate cause of the injuries suffered." Beck v. City if Pittsburgh, 89 F.3d 966, 972 n. 6 (citing Bielevicz, 915 F.2d at 850). Thus, in order to sustain a § 1983 claim for municipal liability, a plaintiff "must simply establish a municipal custom coupled with causation-i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this

failure, at least in part, led to their injury." Id. at 972.

Here, Harris asserts that the City is liable to him for the unlawful actions performed against him by Paige. He contends that the City was "deliberately indifferent to the consequences of its strict disciplinary actions against Defendant Paige." (Pl.'s Resp. Mot. Summ. J. at 17.) Harris states further that Paige's disciplinary record shows the City's "deliberate indifference to the obvious consequences of its policies. Citizens were robbed, beat, raped, and possibly murdered by Defendant Paige." (Id.) We disagree, and find that the City is not liable for the actions of Paige.

In addressing the issue of municipal liability on the part of the City, we are of the opinion that it is necessary to first outline Paige's disciplinary history since he became a Philadelphia police officer in October 1989. The following are summaries of Paige's violations of PPD regulations:

> 1. On May 4, 1990, Officer Paige pled guilty to falling asleep on duty, and allowing a prisoner to escape through carelessness or neglect in violations of PPD Disciplinary Code ("Disciplinary Code"). He was suspended for six days. (Pl.'s Resp. Mot. Summ. J., Ex. 6);
>
> 2. On May 29, 1990, Officer Paige was found guilty of repeated violations of the Disciplinary Code for sleeping while on duty, and was suspended for ten days. (Id. at Exs. 7-8);
>
> 3. On August 25, 1993, Officer Paige was found guilty of "neglect of duty," and suspended for five days. (Id. at Ex. 9);
>
> 4. On September 11, 1993, Officer Paige was disciplined for making an unexplained pursuit of a motorist out of his district. He was assigned to "footbeats, so he has time to reflect on PPD

policy." (Id. at Ex. 10);

5. On February 4, 1994, Officer Paige was found guilty of "neglect of duty" by the Police Board of Inquiry. (Id. at Ex. 11);

6. On January 19, 1994, Officer Paige was charged with violating the Disciplinary Code for failing to complete a complaint or incident report regarding taking a prisoner into custody, and for failure to complete a property receipt concerning property that was allegedly illegally taken from the prisoner. The facts from the IA's investigation indicate that while on patrol, Officer Paige responded to a radio call, "Guns shots on the highway." At the scene, Officer Paige encountered Ulises Rodriguez whom he took into custody. Rodriguez was later released and not charged with any offense. However, later that same day, Rodriguez filed a complaint against Officer Paige alleging that he removed $1200 from his vehicle that was never returned to him. Officer Paige admitted to searching and removing money in a bag from the vehicle and a small television, but he claimed to never knowing how much was in the bag. He also claims that the bag was given back to Rodriguez when he was released. Rodriguez, however, later withdrew his complaint and declined to participate in the IA investigation. Officer Paige was found guilty of failing to complete an incident report, and failure to complete a property receipt. He was suspended for five days. (Id. at Ex. 13);

7. On March 16, 1994, Officer Paige was suspended for a day for failing to follow PPD protocol during a high speed pursuit. (Id. at Ex. 12);

8. On December 29, 1994, Officer Paige was found guilty of "neglecting his duties as a police officer," and was suspended for two days. (Id. at Ex. 14);

9. On January 13, 1995, Officer Paige was charged with violating the Disciplinary Code for failure to "properly patrol [his] beat," "unauthorized absence from assignments, failure to respond to a radio call, idle conversation or loafing," and "repeated violations of departmental rules and regulations." Officer Paige's Commanding Officer, Jose Melendez, recommended that he be dismissed from

10

the force because "[t]his officer has shown that he repeatedly violates the orders of the Commissioner's Directives and has total disregard for his duties. The Officer has been disciplined, trained and counseled without success." Officer Paige was found guilty and suspended for five days. (Id. at Ex. 15);

10. On January 25, 1995, Officer Paige was charged with "neglect of duty" regarding transporting a civilian to his home, being involved in an accident, and "unauthorized absence from assignment." He was suspended for five days. (Id. at Exs. 16-17);

11. On April 8, 1995, Officer Paige was charged with conduct unbecoming an officer for making a false statement in response to an investigation. The facts from the IA investigation of these charges indicate that Officer Paige and an Officer Robert Ralston responded to a radio call of "group of Hispanic males armed with a gun." They apprehended Carlos Torres after a brief foot chase. Torres later filed a complaint alleging that when he was apprehended he was asked by an officer whom he identified as Officer Ralston if he had any drugs or a gun on him. When he responded no for a second time, Officer Ralston struck him in the head with an unidentified object. Torres was placed in the rear of a police wagon and after a few minutes, the officers stopped and ordered him out saying, "You're lucky we have to take this baby to the hospital." When he was ordered out of the wagon, Torres stated that Officer Paige struck him on the side of the face. The investigation report concluded that Torres' "allegation of physical abuse on the part of P/O Ralston is sustained with the collaboration of witnesses' statement[s]. The complaint of physical abuse on the part of P/O Paige is not sustained. Witnesses to the incident did not observe P/O Paige strike the complainant at any time." However, again, Officer Paige's Commanding Officer, Captain Jose Melendez recommended that he be dismissed from the force. He was found guilty of making a false statement in an investigation. (Id. at Ex. 19);

12. On June 12, 1995, Officer Paige was charged with violations of the Disciplinary Codes for sleeping on duty and engaging in outside employment without permission. He pled guilty and agreed to a twenty-day suspension. (Id. at Exs. 24-26);

11

13. On September 12, 1995, Officer Paige was found guilty of violations of the Disciplinary Code for releasing a juvenile prisoner and denying such incident. (Id. at Ex. 27);

14. On June 17, 1996, Officer Paige was charged with "failure to cooperate fully in a departmental investigation" involving the death of Moises DeJesus ("DeJesus") from blows to the head with a "police baton or similar object at least three (3) times."[6] He was also charged with "Making a false statement in response to an official departmental investigation," and "Repeated violations of departmental rules and regulations, and/or any other course of conduct indicating that a member has little or no regard for his responsibility as a member of the Police Department." The investigation report indicates that on August 21, 1994, Officer Paige responded to an incident involving DeJesus. He told IA that he did not strike DeJesus in the head with any object, nor did he see any other officer strike him in the head. He was found guilty and suspended for ten days. It is noted that the investigation also found that all the police personnel who arrived on the scene "failed intentionally to disclose all relevant information or have failed to give a full accounting of the events involved in this matter." (Id. at 28); and

15. On March 4, 1998, Officer Paige was found guilty of violating the Disciplinary Code for failure to appear in court as a police witness in a criminal case. He was suspended for two days.[7] (Id. at Ex. 29.)

From the above, it is apparent that Officer Paige had an extensive history of disciplinary problems during his employment as a Philadelphia police officer. After reviewing such, we

---

[6]Paige denied striking DeJesus, nor seeing any other police officer strike him. (Id. at Ex. 28.) It should also be noted that it was determined that eight other police officers who responded to the incident involving DeJesus were found to have failed to "fully cooperated" in the investigation. (Id.)

[7]Not included in this summary of Officer Paige's disciplinary history is the PPD's investigation and charges against Officer Paige involving the incident at issue before us. Such investigation will be discussed in detail, infra.

12

admit to being perplexed as to why Officer Paige was not dismissed from the PPD long before the incident here occurred. In fact, it was recommended on several occasions after Officer Paige was charged with violating the Disciplinary Code of the PPD that Paige be terminated. For example, as noted above, on January 13, 1995, Officer Paige's Commanding Officer, Jose Melendez, recommended that Officer Paige be dismissed from the force because "[t]his officer has shown that he repeatedly violates the orders of the Commissioner's Directives and has total disregard for his duties. The Officer has been disciplined, trained and counseled without success." (Pl.'s Resp. Mot. Summ. J., Ex. 15.) However, based on this same disciplinary record, we cannot conclude that such history constitutes an acquiescence on the part of the City to keep officers on the job that have dangerous propensities for violence and/or that the consequences of keeping Paige on the force were so obvious that the City's conduct can only be characterized as deliberate indifference. See Bielevicz v. Dubinon, 915 F.2d at 851.

In his Motion, Harris makes some bold accusations in stating that "Citizens were robbed, beat, raped, and possibly murdered by Defendant Paige." (Pl.'s Resp. Mot. Summ. J.at 17.) Although it is certainly acknowledged that Officer Paige has an extensive disciplinary record, accusations of crimes such as robbery, rape, and murder are not supported by the existing police disciplinary record. As outlined above, Officer Paige's disciplinary violations speak for themselves. They include: numerous instances of sleeping on the job, an unexplained pursuit of a motorist out of the district, wrongfully transporting a civilian home, engaging in outside employment, and other similar violations for which he was suspended for periods of time. Officer Paige's disciplinary record does include offenses which involve serious offenses such as theft and assault. However, none of these more serious allegations were substantiated by

13

corroborating witnesses during IA's investigations of these incidents. (See Pl.'s Resp. Mot. Summ. J. at Exs. 13, 19, 28.)

Moreover, there is also no history in this record that indicates that Officer Paige had a propensity to commit the type of heinous sexual assault that he is alleged to have committed here. The Third Circuit stated in Bielevicz that "Indeed, it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future. 915 F.2d at 851. However, as bad as Officer Paige's disciplinary record is, it is devoid of any sexual assaults or even sexual misconduct. Thus, we conclude that Officer Paige's disciplinary record does not support a finding that the City was aware or should have been aware of similar unlawful conduct in the past, but failed to take precautions against future violations. Id. at 850.

In addition, Harris asserts that by allowing Officer Paige to remain on the police force, the City caused a "state created danger" that caused his injuries. Harris specifically argues that "through its abject failure to heed the warnings and constant pleas of supervisory police officials," the City caused a "state created danger that caused the injuries of Mr. Harris and others." (Pl.'s Resp. Mot. Summ. J. at 17-18.) In Kneipp v. Tedder, the Third Circuit recognized that the "state-created danger" theory can establish a substantive due process violation and give rise to municipal liability under § 1983. 95 F.3d 1199 (3d Cir. 1996). In Bright v. Westmoreland County, this Circuit clarified the four-part "state-created danger" test established in Kneipp. 443 F.3d 276 (3d Cir. 2006). It instructed that the four elements are:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such

14

> that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Id. at 281. Harris argues that the City's reckless conduct meets each prong of Kneipp. However, for the same reasons as discussed in concluding that the City's actions did not constitute a custom as to make it liable for Officer Paige's actions, we find that Harris cannot meet the first element of the "state-created danger" test. Based on Officer Paige's prior violations, it was not foreseeable on the part of the City that he would commit on duty the actions which he is now accused. Accordingly, we find no municipal liability on the part of the City and grant summary judgment in its favor.

**2. Officer Paige**

**A. § 1983 Liability**

To prevail in a § 1983 action, a plaintiff must demonstrate that: "(1) the defendants acted under color of law; and (2) their actions deprived [the plaintiff] of rights secured by the constitution or federal statutes." Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997). As to the first element, it is undisputed that the alleged incident occurred while Officer Paige was on duty as a member of the PPD, and thus, acted under color of state law. See West v. Atkins, 487 U.S. 42, 49 (1988).

The proper analysis regarding Harris' claims of sexual assault under §1983 is whether Officer Paige's actions meets the "shocks the conscience" test as first established by the Supreme

Court in Rochin v. California, 342 U.S. 165, 172 (1952). In Rochin, the Court determined that the forced pumping of a suspect's stomach offended due process and was conduct "that shocks the conscience" and violates the "decencies of civilized conduct." Id. at 172-73. In County of Sacramento v. Lewis, the Supreme Court determined that the "shocks the conscience" standard is to be applied when a plaintiff alleges that actions taken by a government official violated substantive due process. 523 U.S. 833 (1998). The Court found that "the core of the concept" of due process is "protection against arbitrary action" and that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" Id. at 845-46. The Court then held that the substantive element of the Due Process Clause is violated by government action only when it "can properly be characterized as arbitrary, or conscious shocking, in a constitutional sense." Id. at 847; See also United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399 (3d Cir. 2003); Fagan v. Vineland, 22 F.3d 1296, 1303 (3d Cir.1994) (en banc) ("[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience'").

Here, there is no question that Harris' claims against Officer Paige "shock the conscious" and, if true, would certainly constitute substantive due process violations. However, the issue before us is whether there is sufficient evidence in the record to support Harris' due process claims and withstand a motion for summary judgment. We find that it does. As outlined above, the PPD's own IA unit determined after an investigation and based on DNA evidence that Harris had, in fact, been sexually assaulted by Officer Paige. Thereafter Officer Paige was arrested and charged in a criminal complaint. Judge Nastasi-Defino determined that she wanted the "record to

16

reflect in no uncertain terms that there was a sexual act that transpired between the complainant and the Defendant on this particular night in question," but she found that the act was consensual. (Officer Paige Mot. Summ. J., Ex. 7 at 177-78.) Moreover, the Arbitrator who presided over Officer Paige's grievance for reinstatement also found that: "The evidence makes clear that Mr. Harris did perform oral sex on Mr. Paige on March 17, 2007, sometime between 2:30 a.m. and 5:00 a.m. Though this is denied by Mr. Paige, the DNA test results of sperm found in a Styrofoam cup Mr. Harris spat into after the oral sex, when combined with Mr. Harris' testimony, proves oral sex took place." (Officer Paige Mot. Summ. J., Ex. 8 at 2.) (Id. at 18.) The Arbitrator, however, determined that the City had not met its burden of proving that a sexual assault had occurred. (Id. at 23.)

Despite these three determinations that a sexual act did occur between Officer Paige and Harris, in this instant action, Officer Paige testified at his deposition that no such act occurred. In fact, in attempting to explain how his sperm got into the cup mixed with Harris' saliva, Officer Paige also once again offered the outrageous testimony that Harris must have found one of his used condoms in the Fairmont Park woods where he used to bring women for sex. He testified:

> Q. Okay. It's still your contention that you didn't have any sexual encounter whatsoever with Mr. Harris?
>
> A. Yes, that's correct.
>
> Q. And is it still your contention that Mr. Harris must have gone out there and got one of your many condoms from the woods?
>
> A. That's correct.

17

> Q. And used that condom at some point down the line to mix it up with his own saliva in a cup. Is that your contention?
>
> A. That's about the only thing I can come up with.
>
> * * * *
>
> Q. There were so many condoms with your DNA in Fairmont Park that one just - - could just pick up a random one and it would be yours? Is that what your testimony is?
>
> A. In that area, yes. And it's not too - - so many, it's just that area, that's correct.

(Officer Paige's Dep. at 92-93.) Thus, it is apparent from Officer Paige's own testimony that genuine issues of material fact exist here. Officer Paige claims that no sexual act occurred and Harris contends that not only did sexual acts occur between him and Officer Paige, but that Officer Paige he forced him to commit such acts. Accordingly, we deny Officer Paige's Motion for Summary Judgement with regard to the § 1983 claim.

### B. State Law Claims

Lastly, Officer Paige asserts that summary judgment should be granted on Harris' state law claims of action of assault and battery,[8] false imprisonment,[9] and intentional infliction of

---

[8] In Pennsylvania, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk v. City of Pittsburgh, 641 A.2d 419, 421 (Pa. 1994).

[9] Under Pennsylvania law, the "elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention." Renk, 641 A.2d at 293.

emotional distress.[10] Amazingly here, despite the fact that Officer Paige testified under oath at his deposition that no sexual act(s) occurred between him and Harris, he argues in this Motion that summary judgment should be granted on these state law claims because "Harris consented to the touching, oral sex, and voluntarily returned to the park and oral sex." (Officer Paige Mot. Summ. J., at 20.)

Consent is a defense to the intentional torts of assault and battery. See Levenson v. Souser, 557 A.2d 1081, 1088 (Pa. Super. 1989); Restatement (Second) Torts § 892A ("One who effectively consents to the conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for the harm resulting from it."). Because the issue of consent is obviously a jury issue in this case, we deny Officer Paige's request for summary judgment on Harris' claim for assault and battery.[11] Moreover, for this same reason we deny summary judgment on the claims of false imprisonment and intentional infliction of emotional distress. Accordingly, Officer Paige's Summary Judgment Motion is denied in its entirety.

An appropriate Order follows.

---

[10] To state a claim for the intentional infliction of emotional distress, a plaintiff must allege that the defendant "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress" to the plaintiff. Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650 (Pa. 2000).

[11] Officer Paige also asserts that he is immune from suit under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S.A. §§ 8541 et seq. This argument, however, is baseless because Section 8541's general grant of immunity gives way to Section 8550's abrogation of immunity for intentional torts. See, e.g., Palmer v. Bartosh, 959 A.2d 508, 512 ("Section 8550 of the Act abrogates the defense of government immunity to which a government employee otherwise may be entitled under the Act where it has been judicially determined that the act of the employee caused the injury and that the act was intentional, i.e., constituted a crime, actual fraud, actual malice, or willful misconduct").

19